# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SAN JOAQUIN VALLEY RAILROAD COMPANY, et al.,<br><br>　　　　Defendants. | CASE NO. 1:08-cv-01086-AWI-SMS<br><br>ORDER DENYING DEFENDANT'S MOTION TO AMEND ITS COUNTERCLAIMS<br><br>(Docs. 179 and 204) |

On January 11, 2010, Defendant San Joaquin Valley Railroad Company ("SJVR") moved for leave to amend its counterclaim to add two new tort claims (fraud and fraudulent misrepresentation). The Magistrate Judge denied SJVR's motion on December 14, 2010. SJVR moved for reconsideration by the District Court, which vacated the December 14, 2010 order and remanded the motion to the Magistrate Judge for reconsideration of Plaintiff BNSF Railway Company's ("BNSF") contentions of (1) prejudice, (2) untimeliness, and (3) futility arising from the general California rule that a breach of contract will not give rise to a tort claim. Having reviewed the record, the parties' arguments, and applicable law, this Court denies SJVR's motion to amend its counterclaims to add tort claims.

1

## I. Discussion

If a party has already amended its pleadings once as a matter of course, further amendment requires the consent of the adverse party or leave of the court. F.R.Civ.P. 15(a). Courts should freely grant leave to amend when justice so requires. *Id.* In general, courts should apply this policy with "extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), *quoting Moronga Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). The Supreme Court directed district courts to consider the following specific factors in deciding whether to grant a motion to amend:

> In the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

The factors are not to be given equal weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Prejudice to the opposing party must be given the greatest weight. *Id.* The factors should not be understood rigidly or evaluated mechanically; the court should "examine each case on its facts" and determine the propriety of granting leave to amend on that basis. *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F.Supp.2d 1081, 1086 (S.D.Cal. 2002), *quoting* 6 Charles Alan Wright, et al., *Federal Practice and Procedure Civil 2d* § 1430 (2d ed. 1990). "Absent prejudice, or a strong showing of any of the other the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *SAES Getters*, 219 F.Supp.2d at 1086.

///

The District Court remanded this matter to the Magistrate Judge for reconsideration of SJVR's motion to amend in light of three factors: (1) prejudice to BNSF; (2) untimeliness of the motion to amend; and (3) futility arising from the general California rule that a breach of contract will not give rise to a tort action.

### A.   **Untimeliness and Prejudice**

In evaluating a motion for leave to amend, a court may consider the moving party's undue delay in pursuing the amendment. *Bowles v. Reade*, 198 F.3d 752, 757-58 (9th Cir. 1999). BNSF contends that, because SJVR's motion to amend was filed after the close of discovery, SJVR unduly delayed moving to add the tort counterclaims. Granting leave to amend at this late date would greatly prejudice BNSF. This Court agrees that SJVR unduly delayed in bringing its tort counterclaims, thereby prejudicing BNSF.

Delay alone is generally insufficient justification for denying a motion to amend unless the court also specifically finds prejudice to the opposing party, bad faith of the moving party, or futility of amendment. *Id.* at 758. Certain factors may justify permitting late amendment of pleadings: restatement of a claim already in issue; new instances of previously alleged statutory violations; timing early in the discovery period or long before trial; the party's loss of its claim if it were not added to the pending suit; delay but no prejudice to the opposing party; or a claim that may be tried on its merits with no additional facts. *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 715-16 (S.D.N.Y. 1982).

Undue delay is delay that prejudices the nonmoving party or imposes unwarranted burdens on the court. *Mayreaux v. Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004). Prejudice results when an amendment would unnecessarily increase costs or

3

would diminish the opposing party's ability to respond to the amended pleading. *Morongo Band*, 893 F.2d at 1079. "Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided." *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999). As BNSF reminds us, SJVR's motion to amend was brought after discovery had closed.

A moving party's inability to acceptably explain its delay may also indicate that the delay was undue. *Swanson v. United States Forest Service*, 87 F.3d 339, 345 (9th Cir. 1996); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990); *E.E.O.C. v. Boeing Co.*, 843 F.2d 1213, 1222 (9th Cir.), *cert. denied*, 488 U.S. 889 (1988). Whether the moving party knew or should have known the facts and theories raised in the proposed amendment at the time it filed its original pleadings is a relevant consideration in assessing untimeliness. *Jackson*, 902 F.2d at 1388. For example, in *Campbell*, the district court did not abuse its discretion in denying a plaintiff's motion to amend which was filed one year after discovery ended, after dispositive motions had been filed, and between five and six years after the complaint was filed, and which incorporated allegations based on facts that were available to the plaintiff when he filed his complaint. 166 F.3d at 1162.

In *Mayreaux*, the Fifth Circuit considered a motion to amend that was clearly untimely since the case had been in the court for years and the discovery period was ending. 376 F.3d at 427-28. An untimely motion to amend, said the court, may either (1) present alternative theories of recovery under the existing facts or (2) fundamentally alter the nature of the case. *Id.* at 427. When an amendment merely incorporates alternative theories using existing facts, it falls safely within Rule 15(a)'s policy of promoting litigation on the merits over procedural technicalities.

4

*Id.* But when, after a period of extensive discovery, a party proposes a late-tendered amendment that would fundamentally change the case to incorporate new causes of action and that would require additional discovery, the amendment may be appropriately denied as prejudicial to the opposing party. *Id. See also Solomon v. North American Life and Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (finding that the district court did not abuse its discretion in denying leave to amend based on undue delay and prejudice since the motion, made on the eve of the discovery deadline, would have required re-opening discovery and delaying the proceedings); *Morongo Band*, 893 F.2d at 1079 (holding that the district court did not abuse its discretion in denying leave to amend when plaintiffs moved to amend two years after the initial filing, and the new claims would have greatly altered the nature of the litigation and required the opposing party to prepare "an entirely new course of defense"); *Singh v. City of Oakland*, 295 Fed. Appx.118, 122 (9th Cir. 2008) (holding that the district court did not abuse its discretion in denying the plaintiff leave to amend his complaint a month before the scheduled trial when the plaintiff had known the facts alleged in the proposed amendment for at least two years before moving for leave to amend and the new claims would have required additional discovery and trial preparation, prejudicing the opposing parties and delaying the proceedings).

"A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999). *See also Elite Entertainment, inc. v. Khela Brothers Entertainment*, 227 F.R.D. 444, 448 (E.D.Va. 2005) (finding the defendants' motion to file amended counterclaims that would expand scope and theory of liability just before

///

the expiration of the previously extended discovery period and weeks before trial to be untimely and prejudicial).

In assessing whether SJVR unduly delayed in moving to amend its counterclaims, both SJVR and the District Court focus on SJVR's September 30, 2010 filing of its motion to amend its counterclaims and attribute SJVR's undue delay to delays associated with the Court's resolution of pending summary judgment motions. Attributing SJVR's delay to the pending motions misses the point. Factual discovery ended on November 30, 2009. SJVR filed its answer to the amended complaint on the same date without any indication of a need or desire to amend its counterclaims to incorporate tort claims. SJVR did not even disclose its tort counterclaims until January 11, 2010, in the First Amended Counterclaim that was stricken for SJVR's failure to move for leave to amend or to secure the consent of BNSF. Having first filed the amended counterclaims after the close of discovery, SJVR unduly delayed asserting the tort counterclaims.

SJVR attempts to justify its delay by claiming that it was not aware that it had potential tort counterclaims until the deposition of its executive, Mike Haeg, on November 20, 2009. This is not a case of a litigant being surprised by the deposition testimony of a representative of its opponent. As SJVR's employee, Haeg was available to SJVR and its attorneys well before the deposition date. SJVR knew or should have known relevant facts known to its employees and executives, including Haeg, well before the end of discovery. That SJVR and its attorneys had not determined Haeg's factual knowledge about its pending claims is not credible.

Even if this Court were to accept SJVR's assertions that it had no actual knowledge of the alleged torts until Haeg's deposition, SJVR filed an answer to the amended complaint ten days

6

after Haeg was deposed without pleading the tort counterclaims nor disclosing any intent to do so. SJVR had actual knowledge of Haeg's testimony by that time.

SJVR's delay was unquestionably prejudicial to BNSF, which had no clue that it might be required to respond to tort claims of fraud and misrepresentation until after discovery had closed. In the absence of these tort claims, BNSF had no reason to further probe Haeg for facts relevant to fraud or fraudulent misrepresentation. Having reviewed the transcript of Haeg's deposition, this Court finds first that Haeg's vague testimony regarding the timing and content of the statements of BNSF employee Galassi was not sufficient to have alerted an opposing party's attorney to probe more deeply into possibilities of tortious fraud or misrepresentation. Second, although BNSF's attorneys actually did attempt to further develop and refine Haeg's account of his conversation with Galassi, Haeg's responses continued to be vague and uncertain. Nor did the later deposition of Patterson, necessitated by the actions of SJVR's attorney in an earlier attempt at deposing Patterson, serve to provide sufficient discovery of facts relevant to SJVR's tort claims.

Although the costs of prosecuting or defending a lawsuit may be substantial, cost alone is not prejudicial. Discovery or other litigation costs become prejudicial only when the additional costs could easily have been avoided had the proposed amendments been included within the original pleading. *Amerisource-Bergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 653 (9th Cir. 2006). In *Amerisource-Bergen*, the plaintiff filed a breach of contract action alleging that the defendant had provided various counterfeit drugs; the defendant counterclaimed for payment for a particular drug, Procit, that the plaintiff conceded was genuine. *Id.* at 949. At the end of the discovery period, the defendant moved for summary judgment on its counterclaim. The plaintiff

then sought to amend its complaint to allege that the Procit that it received from the defendant was tainted, providing no explanation for its change of position or its failure to plead the claim in its original complaint. *Id.* at 953, n. 9. The court found the additional discovery would be more expensive than usual in light of the short discovery time remaining and the additional time demands on opposing counsel. The additional cost was prejudicial since it could have been avoided if the plaintiff had alleged that the product was tainted in the original complaint. *Id.* at 953.

The additional costs in time and money are similarly prejudicial here. The scope of discovery in this case was nationwide, requiring attorneys for both parties to travel substantial distances and expend substantial time to depose witnesses and to secure other discovery. Reopening discovery would require duplication of time and expense to again depose witnesses regarding SJVR's last minute tort claims. SJVR's undue delay is prejudicial to BNSF, weighing strongly against a grant of permission to amend.

**B.     Futility of Claims**

An amendment may be denied if it is futile. *Kiser v. General Elec. Corp.,* 831 F.2d 423, 428 (3d Cir.), *cert. denied*, 485 U.S. 906 (1987). The test for futility "is identical to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). "[W]here the proposed amendment is insufficient in law and would thus be a useless act, it is proper, at least in this Circuit, to deny leave to amend." *Gilbertson v. City of Fairbanks*, 262 F.2d 734, 740 (9th Cir. 1959).

"[D]ismissal for failure to state a claim is 'proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'" *Shroyer v.*

*New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010), *quoting Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Put another way, "dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Eminence Capital*, 316 F.3d at 1052.  *See also Chaset v. Fleer/Skybox Internat'l, LP*, 300 F.3d 1083 (9th Cir. 2002) (concluding that the motion to amend was futile since a basic flaw in the pleading could not be cured by further amendment). "[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter to state a facially plausible claim to relief." *Shroyer*, 622 F.3d at 1041, *citing Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

The District Court directed that, on remand, the Magistrate Judge address the legal, not factual, sufficiency of SJVR's tort claims.  BNSF contends that SJVR's proposed amended counterclaims are futile since, under California law, a party may not plead tort claims that are properly breach of contract issues.

Hammering away on the factual sufficiency of its claims of fraud and fraudulent misrepresentation, SJVR never addresses the California rule.  Instead, SJVR concedes that the claims are duplicative, arguing that the tort claims "are based on the <u>same facts</u> about BNSF's misrepresentations" that have been pled to defeat BNSF's argument that the breach of contract action is barred by the statute of limitations.

Contracts are the means by which parties mutually define their respective obligations, risks, and rewards. *Erlich v. Menezes*, 21 Cal.4th 543, 558 (1999).  Limiting available damages to those contemplated by the parties when they entered into the contract encourages commercial activity by enabling parties to assess in advance the financial risks of the enterprise.  *Erlich*, 21 Cal.54th at 558.

9

"A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations." *Aas v. Superior Court of San Diego County*, 24 Cal.4th 627, 643 (2000), *superseded by statute on other grounds*, *Rosen v. State Farm Gen'l Ins. Co.*, 30 Cal.4th 1070 (2003). "'[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.'" *Erlich*, 21 Cal.4th at 552, *quoting Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal.4th 85, 107 (1995) (Mosk, J., concurring and dissenting).

The California Supreme Court has explained that in analyzing tort claims arising out of commercial contracts:

> The benefits of broad compensation must be balanced against the burdens on commercial stability. Courts should be careful to apply tort remedies only when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be . . . to aid rather than discourage commerce.

*Erlich*, 21 Cal.4th at 554 (*internal quotations and citations omitted*).

Providing tort remedies in connection with a breach of contract is particularly inappropriate when the sole injury to the plaintiff is economic. *Id.* at 554-55. In California, economic losses are defined as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits–without any claim of personal injury or damages to other property." *Frank M. Booth, Inc. v. Reynolds Metal Co.*, 754 F.Supp. 1441, 1449 n. 4 (E.D.Cal. 1991). "The line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." *Id.* When a fraud claim is based on a parties' alleged failure to comply with a contractual duty, "the proper cause of action is breach of contract, not fraud." *Auto Industries Supplier Employee Stock Ownership*

10

*Plan (ESOP) v. Snapp Systems, Inc.*, 2006 WL 3627935 at *5 (E.D. Mich., December 12, 2006) (No. 03-74357).

"[T]he economic loss rule 'prevent[s] the law of contract and the law of torts from dissolving one into the other.'" *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004), *quoting Rich Products Corp. v. Kemutec, Inc.,* 66 F.Supp.2d 937, 969 (E.D. Wis. 1999), *aff'd*, 241 f.3d 915 (7th Cir. 2001).  The rule depends on the distinction between commercial transactions in which economic expectations are protected by commercial and contract law, and transactions with individual consumers who are injured in a manner traditionally addressed through tort law. *Robinson Helicopter*, 34 Cal.4th at 988.  "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id.*  Accordingly, the economic loss rule will bar a party's claim of tortious breach of contract unless the party alleges tortious behavior independent of the breach of contract. *Id.* at 991.

Nonetheless, a party may allege a tortious breach of contract for intentional actions not typically contemplated by parties entering a contract.  "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Erlich*, 21 Cal.4th at 551.  "[O]utside the insurance context, 'a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or, (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of

11

mental anguish, personal hardship or substantial consequential damages.'" *Id.* at 553-54, *quoting Freeman & Mills*, 11 Cal. 4th at 105 (conc. and dis. opin. of Mosk, J.). "Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." *Erlich*, 21 Cal.4th at 554.

The California Supreme Court has "strongly suggested" that, in the absence of the violation of a duty arising under tort law independently of the breach of contract itself, lower courts should limit tort recovery in breach of contract actions to the insurance area. *Freeman & Mills*, 11 Cal.4th at 95. California courts have only permitted tort damages in contract cases in which the tort liability is "either completely independent of the contract"; arises from intentional conduct intended to harm, such as when a breach of duty causes a physical injury; in insurance contract actions involving a breach of the covenant of good faith and fair dealing; for wrongful discharge in violation of fundamental public policy; or when the plaintiff was fraudulently induced to enter the contract. *Erlich*, 21 Cal.4th at 551-52. Because this case involves neither a physical injury, wrongful discharge, nor fraudulent inducement, SJVR's claims may only proceed if they constitute a duty arising under tort law independent of the breach of contract itself.

The California Supreme Court performed an analysis focusing on intentional conduct in tortious contractual breach in *Robinson Helicopter*, 34 Cal.4th at 989. Robinson, a helicopter manufacturer, contracted with Dana for sprag clutches, a component that permits the rotor blades to continue spinning if a helicopter loses power during flight, allowing the pilot to safely land the helicopter. *Id.* at 985. Robinson's type certificates[1] for two helicopter models required the

---

[1] A type certificate is issued by the Federal Aviation Administration (FAA) for each type of aircraft manufactured in the United States. Each aircraft must be produced exactly in compliance with the design set forth in its type certificate. Any changes in specifications require prior FAA approval.

12

hardness level of the sprag clutches to be "50/55 Rockwell." *Id.* During the course of the contract, Dana modified its manufacturing process to produce the sprag clutches with a hardness of "61/63 Rockwell" without disclosing the change to Robinson or the FAA. *Id.* at 985-86. Despite the change from the required specification, with each delivery of sprag clutches, Dana continued to provide Robinson with written certification that the sprag clutches had been manufactured to the 50/55 Rockwell specifications of the type certificates. *Id.* at 986. At some point thereafter, Dana switched back to manufacturing the sprag clutches with a hardness of 50/55 Rockwell, again without notifying Robinson or the FAA of the change. *Id.*

The sprag clutches manufactured to 61/63 Rockwell proved substantially more likely to fail in use that those manufactured to 50/55 Rockwell. *Id.* Following investigation of eleven failed sprag clutches returned to Robinson by its operator customers, Dana disclosed that it had manufactured the failed sprag clutches to a hardness of 61/63 Rockwell but refused to provide the serial and lot number identification necessary to identify the nonconforming sprag clutches for several months. *Id.* at 987. Documents provided later in discovery revealed that Dana had included the identification numbers in the draft of its disclosure letter but deleted them from the final version. *Id.* at 987 n. 4.

Ultimately, the FAA and its British equivalent required Robinson to recall and replace all 990 clutch assemblies in which the sprag clutch had been manufactured to 61/63 Rockwell. *Id.* at 986. Recall and replacement cost Robinson $1,555,924 in replacement parts and employee time. *Id.* at 986-87.

After Robinson identified the sprag clutches as defective, it submitted the necessary order to Dana, noting that allocating the cost of the replacement parts could be addressed later. *Id.*

Dana, the sole manufacturer of sprag clutches, disclaimed responsibility, contending that the defect resulted from Robinson's defective designs, and refused to ship any parts except on a COD or assured payment basis. *Id.* at 987.  Having no alternative supplier, Robinson purchased the necessary replacements from Dana but later sued Dana for breach of contract, breach of warranty, and negligent and intentional misrepresentation. *Id.*  Robinson alleged three separate bases for its fraud and misrepresentation claims: (1) Dana's provision of false certificates of conformance, (2) Dana's failure to provide the serial numbers of affected clutches until five months after the clutches failed, and (3) a Dana employee intentionally redacted reference to the clutches' hardness on a list of products requested by Robinson. *Id.* at 990.

In its review of the proceedings below, the California Supreme Court determined that Dana's provision of false certificates of conformance constituted a tort (fraud) independent of Dana's breach of contract:

> By issuing false certificates of conformance, Dana unquestionably made affirmative representations that Robinson justifiably relied on to its detriment. But for Dana's affirmative misrepresentations by supplying false certificates of conformance, Robinson would not have accepted delivery and used the nonconforming clutches over the course of several years, not would it have incurred the cost of investigating the cause of the faulty clutches. Accordingly, Dana's tortious conduct was separate from the breach itself, which involved Dana's provision of nonconforming clutches.  In addition, Dana's provision of faulty clutches exposed Robinson to liability for personal damages if a helicopter crashed and to disciplinary action by the FAA.  Thus, Dana's fraud is a tort independent of the breach.

*Id.* at 990-91.

Having found that Dana's fraud and intentional misrepresentation was independent of its breach, that is, the provision of nonconforming sprag clutches, the court held that the economic loss rule did not bar Robinson Helicopter's tort claims. *Id.* at 991.

Rejecting the dissent's argument that the economic loss rule should bar tort recovery in every case with only economic damages, the court emphasized, "The economic loss rule is designed to limit liability in commercial activities that negligently or inadvertently go awry, not to reward malefactors who affirmatively misrepresent and put people at risk." *Id.* at 991 n.7. Public policy, said the court, favors an exception to the general rule of enforcing breaches through contract law "when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies." *Id.* at 991-92, *quoting Freeman & Mills*, 11 Cal.4th at 107. Because fraud, such as that practiced by Dana, is not a socially desirable business practice, permitting Robinson's claims for fraud and misrepresentation to proceed discourages fraud and deceptive practices in business. *Robinson Helicopter*, 34 Cal.4th at 992. Rejecting Dana's arguments that it apply the economic loss rule, the court added:

> A breach of contract remedy assumes that the parties to a contract can negotiate the risk of loss occasioned by a breach. When two parties make a contract, they agree upon the rules and regulations that will govern their relationship; the risks inherent in the agreement and the likelihood of its breach. The parties to the contract in essence create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks. Under such a scenario, it is appropriate to enforce only such obligations as each party voluntarily assumed, and to give him only such benefits as he expected to receive; this is the function of contract law. However, a party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. No rational party would ever enter into a contract anticipating that they are or will be lied to.

*Id.* at 992-93 (*internal quotations and citations omitted*).

Nonetheless, the court emphasized that its holding was intended to be "narrow in scope and limited to a defendant's affirmative representations on which a plaintiff relies and which

expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." *Id.* at 993.

In contrast, the absence of exposure to additional liability independent of economic loss is the factor that prevents SJVR's tort claims from being cognizable independent of its breach of contract claims. Assuming the truth of SJVR's allegations, as we must do for purposes of this order, BNSF's fraudulent representations are an inseparable component of the breach of its contract to pay a specific calculated amount to SJVR as through rates for SJVR's carriage of BNSF's rail cars on its lines. As SJVR itself wrote, "BNSF's contractual obligation to provide rate information under the 1992 Agreement presupposes that it has to provide <u>truthful</u> rate information." Doc. 211 at 6. Although BNSF's fraudulent representations offend public policy, they do not expose SJVR to any liability separate from its economic claims. Accordingly, since California law precludes SJVR's recasting its breach of contract claims as tort claims, the proposed amendment of the counterclaims would be futile.

### III.     Conclusion and Order

Even if SJVR's undue delay were not prejudicial to BNSF, its proposed tort claims are futile under California law precluding tort remedies for breaches of contract. Accordingly, granting SJVR's motion to amend its counterclaims is inappropriate.

This Court HEREBY DENIES SJVR's motion to amend its counterclaims to add tort claims of fraud and fraudulent misrepresentation.

IT IS SO ORDERED.

**Dated:     August 2, 2011**                              /s/ Sandra M. Snyder
                                                                        UNITED STATES MAGISTRATE JUDGE