1
2
3
4
5
6
7
8

# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY, a Delaware Corporation, | CV F 08 - 1086 AWI SMS |
| Plaintiff, | MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION |
| v. | |
| SAN JOAQUIN VALLEY RAILROAD COMPANY, a California Corporation, and TULARE VALLEY RAILROAD COMPANY, a Nevada Corporation, | Doc's No. 121, 127 and 128 |
| Defendants. | |

          This is an action for breach of contract by plaintiff BNSF Railway Company ("BNSF" or "Plaintiff") against defendants San Joaquin Valley Railroad Company ("SJVR") and Tulare Valley Railroad Company ("TVRR") (collectively, "Defendants"). The currently-operative First Amended Complaint ("FAC") was filed by BNSF on November 6, 2009. On November 30, 2009, SJVR filed an answer to the FAC that incorporated counterclaims against BNSF for declaratory judgment on breach of contract and damages. Currently before the court are cross-motions for summary judgment or summary adjudication by BNSF, Doc. # 121, TVR, Doc. # 128, and SJVR, Doc. # 127. TVRR, in its motion for summary judgment seeks its own dismissal from this action. The court will consider TVRR's motion first and will then proceed to the cross-motions of SJVR and BNSF. Diversity Jurisdiction exists pursuant to 28 U.S.C. § 1332. Venue is proper in this court.

**TVRR'S MOTION FOR SUMMARY JUDGMENT**

## I.  Factual Background

BNSF's FAC alleges that its predecessor, the Atchison, Topeka and Santa Fe Railroad Company (hereinafter "Santa Fe"), entered into an agreement with TVRR in November 1992 leasing and selling "designated rail lines between Bakersfield and Fresno, California (the "1992 Agreement").[1]  Shortly thereafter, TVRR entered into a service agreement with SJVR wherein the latter carried out most of the operations and received a set proportion of the tariffs paid to TVRR by BNSF.  BNSF alleges that it set routes and rates for freight originating from or delivered to stations covered by the 1992 Contract according to the terms of the 1992 Agreement.  Until April 1, 1994, TVRR paid SJVR from the funds that were collected by BNSF and paid to TVRR according to a percentage that was agreed upon between TVRR and SJVR.  Beginning on April 1, 1994, BNSF paid SJVR directly as a result of a letter of agreement between SJVR and BNSF.  In 1999 TVRR sold almost all of its assets to SJVR retaining only a 6-mile rail spur referred to by the parties as the "Ultra to Ducor line" or as the "Ultra Spur."  TVRR contends that the 1999 transfer of assets to SJVR included any claims TVRR may have had against BNSF.  BNSF's FAC alleges that SJVR was acquired by Fortress Investment Group LLC in 2007 and that this action was occasioned by the new owner's contentions that BNSF had breached the terms of the 1992 Agreement and the demand by the new owners for retroactive application of substantially higher rates.  TVRR contends it is neither a proper nor necessary party in this action because it has no interest in the outcome because all rights and duties it may have that are at issue in this action have been assigned to SJVR as a result of the 1999 sale.

## II.  Analysis of Parties Arguments

The FAC alleges a single claim against TVRR for declaratory judgment in which BNSF requests that the court declare the rights of the parties with regard to whether:

---

[1]    The entire document designated the "1992 Agreement" is titled "Agreement for Sale of Certain Assets, Rights and Obligations of The Atchison, Topeka and Santa Fe Railway Company to Tulare Valley Railroad Company" and is set forth under seal and in full at Document # 41.

An actual, justiciable, present and continuing dispute and controversy exists between BNSF and [D]efendants regarding whether Paragraphs 29 and 30 of the [1992 Agreement] are enforceable, whether [D]efendants are obliged to be included in BNSF through routes and to concur in BNSF though rates, and whether BNSF has complied with all other contractual obligations, including those governing the revenue arrangement for direct dealings between SJVR and BNSF.

Doc. # 85 at ¶ 48.  The FAC alleges the court "is empowered and obligated, pursuant to [the Declaratory Judgment Act,] 28 U.S.C. § 2201 to declare the rights and obligations" of the parties with respect to the 1992 Contract.

TVRR has alleged no counterclaims against BNSF and seeks summary judgment on the ground there exists no dispute between TVRR's and BNSF.  BNSF opposes TVRR's motion for summary judgment primarily on two grounds.  First, BNSF contends the 1999 transfer of assets from TVRR to SJVR (hereinafter the "1999 Transfer") did not effectuate a transfer of obligations owed by TVRR to SJVR from 1992 to 1999 under the 1992 Agreement.  BNSF does not specify what those residual obligations might be.  BNSF also contends that TVRR remains owner of the Ultra Spur to the present time and is bound by the terms of pre-existing agreements with regard to freight traffic over that spur.  BNSF therefore contends that TVRR is a proper party because it will be bound by any judgment in this action that declares rights under the 1992 Agreement with regard to either TVRR's obligations prior to 1999 under the 1992 Agreement or since 1999 with regard to any obligations arising from its ownership of the Ultra Spur.  Second,  BNSF contends that BNSF's rights in this action arise from the 1992 Agreement to which TVRR is a signatory and therefore TVRR is an indispensable party.

### A. Declaratory Judgment Act and "Actual Controversy"

BNSF quotes extensively from the 1992 Agreement which, in Paragraph 8, provides certain limitations on the rights of the parties to assign rights and obligations under the Agreement to an assignee or purchaser.  The paragraph quoted by BNSF provides that an assignment of rights to a successor requires that the assignee specifically "assume in writing all of Buyer's or Seller's continuing and existing or thereafter arising obligations under this agreement. . . ."  Doc. # 151 at 7:20-21.  BNSF further highlights Paragraph 8's provision

3

that, although a party to the 1992 Agreement can assign rights and obligations existing at the time of the assignment or accruing thereafter, the assigning party "shall remain responsible after the assignment for those obligations existing up until the time of the assignment. . . ." Id. at 24-25.

As an initial matter, the court notes that there are no allegation of the existence of *obligations* owing by TVRR to BNSF under the 1992 Agreement for any of TVRR's activities between 1992 and the assignment of TVRR's interests to SJVR.  In addition, other than TVRR's retention of the Ultra Spur line, there is no allegation of any *obligation* owed by TVRR to BNSF arising *after* the 1999 assignment to SJVR.  There is also no contention by BNSF, that following TVRR's assignment of its interests to SJVR in 1999, TVRR retained any interest in SJVR's potential recovery against BNSF as a consequence of SJVR's counterclaims against BNSF.  BNSF contends that, because the 1992 Agreement imposes a continuing obligation on TVRR to be responsible for obligations that accrued prior to the date of any assignment and assumption of obligations by SJVR, TVRR's rights and obligations will be affected by BNSF's action for declaratory relief.  BNSF gives no explanation as to how or why TVRR's rights and obligations would be affected other than to posit the hypothetical existence of a potential obligation.

"The Declaratory Judgment Act provides that, '[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'  28 U.S.C. § 2201(a)."  Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126, 127 S.Ct. 764, 770 (2007).  The Medimmune Court directly addressed the issue of what constitutes an "actual controversy" under the Declaratory Judgement Act.  The court held that:

> [T]he dispute [must] be "definite and concrete, touching the legal relations of parties having adverse interests"; that it be "real and substantial" and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." [Aetna Life Ins. v. Haworth, 300 U.S. 227, 240-241 [. . .] (1937).  In Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S> 270, 273 [. . .](1941), we summarized as follows: "Basically, the question in each case is whether

4

1
2

the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

3

Id. at 126.

4

TVRR contends that no "actual controversy" exists between it and BNSF.  The court

5

agrees.  Medimmune and its progeny require something more than the simple fact of a

6

contract to which both the plaintiff and defendant are signatory.  There must be an actual

7

opposition of legal interests that has ripened into an actual controversy.  Here, TVRR has not

8

threatened to sue BNSF under the 1992 Agreement and has, in fact, stated its lack of any

9

interest in the case at all.  BNSF has not pointed to any issue of actual opposition between

10

itself and TVRR under the 1992 Agreement.  With regard to the six-mile Ultra Spur line,

11

discovery has been had, as TVRR points out, and BNSF remains unable to point to any traffic

12

over that spur that occurred since the 1999 transfer of assets to SJVR that would implicate

13

any obligations or rights as between TVRR and BNSF.  BNSF's argument that TVRR is a

14

proper defendant in this action implies that, should BNSF prevail in its action for declaratory

15

judgment, the terms of the 1992 Agreement will apply to freight traffic on TVRR's spur line.

16

TVRR has not contended otherwise nor does BNSF point to any action or representation by

17

TVRR that would indicate even the least probability that TVRR is in a position of

18

"substantial controversy" over BNSF's implied contention.

19

### B. Indispensable Party

20

BNSF cites a number of cases for the proposition that, as a signatory to the 1992

21

Agreement, TVRR is an indispensable party to this proceeding.  Each of the cases BNSF

22

cites, however, concern the application of joinder of indispensable parties under Rule 19 of

23

the Federal Rules of Civil Procedure.  The issue at hand is not one of joinder under Rule 19,

24

however, because TVRR is already a party.  The more appropriate question is whether, and

25

under what conditions, a party that is a signatory to a contract that is the focus of an action for

26

declaratory judgment may be dismissed from the action.  Even though the issue at hand is not

27

one of joinder, Rule 19 provides necessary insight into the question of whether a party can be

28

forced to maintain its status as a plaintiff or defendant when it seeks to be excused from the

proceeding.  Rule 19(a) describes the attributes of a person who must be joined if possible.  That person is "a person in whose absence complete relief cannot be accorded among those who are already parties by affording them a complete adjudication of their dispute."  Japan Petroleum Co. Ltd. v. Ashland Oil, Inc., 456 F.Supp. 831, 836 (D. Del. 1978).  The policy objectives of Rule 19's requirement to join all "indispensable parties" are to "protect the interests of the parties by affording them complete adjudication of their dispute.  It [also] serves the interest of judicial economy by avoiding repeated lawsuits involving the same subject matter."  Id.

While BNSF correctly notes that "[g]enerally, where rights sued upon arise from a contract, all parties thereto must be joined," Regan Henry Broad. Grp., Inc. v. Hughes, 1992 WL 151308 (E.D. Pa. 1992), the status of a party as indispensable does not arise as a result of its being signatory to a contract, it's status as indispensable is the result of the needs of the other parties to fully adjudicate their claims.  There is no policy purpose to be served by compelling a party to maintain its status in an action as plaintiff or defendant where a party, having been joined, is later able to show upon all the evidence that its presence in the action is not necessary to the interests of either party in litigating their claims.  TVRR contends that its presence in this action is not necessary to the claims of either party and the court agrees.  As discussed above, in an action for declaratory judgment, BNSF can only achieve judgment over a party against whom it an actual, present and substantial controversy.  This controversy exists between BNSF and SJVR.  BNSF has the burden under the Declaratory Judgment Act to show it has an "actual controversy" against all Defendants and, as the court has noted, has failed to carry that burden with respect TVRR.

BNSF's action is essentially a preemptive strike against SJVR's claims of breach and SJVR's effort to retrospectively enforce through rates according to its determination.  TVRR, by asserting no counter-claims against BNSF cannot, now or in the future, assert claims against BNSF that it has specifically decided not to assert in this action.  Therefore, BNSF has no claims that it can assert preemptively against TVRR by means of its declaratory judgment claims.  Similarly, TVRR has assigned to SJVR all its *rights* under the 1992

Agreement and has asserted no claims on its own behalf relating to the sole remaining interest it owns in the Ultra Spur line.  Stated another way, SJVR's counterclaims against BNSF are based on rights that have already been assigned by TVRR to SJVR.  As a consequence, TVRR's participation is not necessary in order for SJVR to fully litigate its claims.

Because neither BNSF nor SJVR require the participation of TVRR to fully litigate their claims in this action, and because in seeking dismissal from this action TVRR is estopped from asserting any claims under the 1992 Agreement against BNSF, the court concludes that TVRR is not an indispensable party to this action.  Because TVRR is not an indispensable party and because BNSF has not carried its burden to show that an "actual controversy" exists between it and TVRR, the court concludes that TVRR is entitled to judgment against BNSF as to BNSF's first claim for relief.  TVRR will therefore be dismissed from this action.

## BNSF'S CLAIMS AND SJVR'S COUNTERCLAIMS

The FAC lists four claims for relief.  The first two claims seek declaratory judgment against SJVR on SJVR's claim that BNSF breached its duties under the fee-setting provisions of the 1992 Agreement, and declaratory judgment on SJVR's claim that BNSF breached its duties under the 1994 Letter of Agreement, respectively.  BNSF's third and fourth claims for relief allege that SJVR breached the rate setting provisions of the 1992 Agreement and the 1994 Letter of Agreement, respectively, by attempting to set rates unilaterally and by attempting to recover from BNSF alleged underpayment of rates that SJVR alleges were wrongfully not increased since 1994.

SJVR's answer to the FAC alleges four counterclaims.  The first two counterclaims allege breach of the 1992 Agreement by BNSF arising from BNSF's failure to notify TVRR or SJVR of through rate changes, as required by paragraph 31 of the Agreement, and to increase the division of revenues according to the upward movement of through rates, respectively.  SJVR's third counterclaim seeks declaratory judgment on the issue of whether SJVR has sole discretion to set rates under the 1992 Agreement in light of BNSF's breaches.

SJVR's fourth counterclaim alleges breach of the 1992 Agreement by BNSF arising from BNSF's refusal to pay rates unilaterally set by SJVR in 2008 under the rate-setting authority claimed by SJVR under the 1992 Agreement.

Somewhat atypically, the motions for summary judgment consist basically of two opposing propositions regarding SJVR's counterclaims against BNSF. SJVR seeks summary judgment in its favor and BNSF seeks summary judgment on SJVR's counterclaims in its favor. Neither party appears to have moved for summary judgment as to the claims alleged in BNSF's FAC.

## I. The 1992 Agreement and Subsequent Agreements

At the core of the dispute between the two remaining parties is the question of what provisions of which agreement provide the basis for the revenues that were paid to SJVR from 1992 to 1999, and from 1999, when SJVR purchased most of TVRR's interest, to 2008, when this action was commenced. SJVR contends that BNSF's authority to set rates, and SJVR's duty to concur in those rates, was conditioned under the terms of the 1992 Agreement on BNSF's performance of its duty under that agreement to report at year's end the percent of increase or decrease in the through rates charged by BNSF for freight arriving at, or originating from, the stations listed in Table 1 and to apply that percent change to the rates set forth in Table 1. BNSF's authority to set rates and the duty of short-line hauler to concur in those rates is set forth in Paragraph 30 as follows:

> As part of Buyer's and Seller's agreement to cooperate in marketing their interline freight transportation service via the California Interchange Points to an from the Market Area, Buyer and Seller agree that, for twenty-five years following the date of closing of this agreement, Seller shall have authority to establish and offer through freight rates via though routes involving both Buyer and Seller with interchange between Buyer and Seller at such California Interchange Points. Buyer hereby automatically concurs in all such through rates established by Seller, whether for present or future freight traffic, so long as Buyer shall receive for transporting the traffic the amount of revenue set forth in Paragraph 31 of this agreement.

BNSF's duty to calculate, report and apply percent changes to the rate is set forth in Paragraph 31, *Division of Revenue*, provides as follows:

> Buyer and Seller agree that for so long as Seller establishes through freight rates for interline freight transportation service via the California Interchange

Points routes as authorized in Paragraph 28 and Paragraph 29 of this agreement, the through revenues accruing to Buyer on all existing and future traffic movements via the California Interchange Points to or from rail destinations or origins at facilities on or along the Rail Lines and interchanged between Buyer and Seller shall be divided on the basis of the General Traffic Divisions set forth in Table 1, included as part of this Paragraph.  Buyer agrees to concur in all through freight rates established by Seller on all existing and future carload traffic movements via the California Interchange Points to or from rail destinations or origins at facilities on or along the Rail Lines, whether a rate is in a tariff, quotation, freight transportation contract, or some other transportation offer or agreement, so long as Buyer receives for transporting the traffic the amount of revenue set forth in Table.

[Non-relevant portion and Table 1 omitted]

At the end of each calendar year, commencing with year-end 1993, Seller shall determine whether there has been a percentage increase, percentage decrease or no change in the level of its through rates on movements to or from the stations listed in Table 1 between the moth of January of the subject year and the month of December of the such year. Seller shall notify Buyer of the results of this determination and any percentage change, whether an increase or a decrease, shall be applied to the divisions set forth in Table 1 for movements to or from the above-referenced stations during the calendar year immediately following the year for which the determination was made.  Nothing in this agreement shall preclude Seller and Buyer from negotiating and agreeing to different divisions than those specified in Table 1 for contract movements to or from any of the aforementioned stations.

Doc. 41 at ¶¶ 30-31.  SJVR's central contention is that BNSF's failure to report its yearly percentage increase or decrease in Rates and to apply the percentage to the Rates listed in Table 1 deprived BNSF of Rate-setting authority and constituted breach of the 1992 Agreement.

BNSF contends that, as the 1992 Agreement provides that "[n]othing in [the] agreement shall preclude Seller and Buyer from negotiating and agreeing to different divisions [of revenue] than those specified in Table 1," and that the parties to the 1992 Agreement took the opportunity to negotiate a different division almost immediately.  The parties have submitted a number of letters, memoranda, amendments and other writings that BNSF contends have served to modify or supplant the rate-setting terms of the 1992 Agreement; particularly the duty of BNSF to provide yearly statements of upward or downward movement of through rates and to adjust Table 1 rates accordingly.  From the execution of the 1992 Agreement to April 1, 1994, the court is aware of three documents that

9

the parties have referred to as relevant in one respect or another to the binding or non-binding nature of the rate-setting authority of the 1992 Agreement.  The court will briefly discuss each of these documents.

### A.  Marketing Agreement of November 24, 1992

On November 24, 1992, all parties – including TVRR, SJVR, and Santa Fe Railroad, the predecessor of BNSF – executed an agreement of cooperation in which the parties agreed to cooperate in the efforts of each to market freight traffic to and from locations in the "market area" which included stations and lines owned at the time by TVRR and operated by SJVR.  Doc. # 52, Exhibit "B" (Sealed) (hereinafter, the "Marketing Agreement").  The primary basis of cooperation the parties agreed to was the ability of Santa Fe (now BNSF) to set through routes and through rates and the obligation of TVRR and SJVR to concur in those routes and rates.[2]  Of significance to BNSF's contentions, the Marketing Agreement does not impose a duty on BNSF to report percentages of rate increase or decrease or to adjust revenue sharing on the basis of percentage of change.  Paragraph 3 of the Marketing Agreement provides as follows:

> Tulare and SJV Railroad shall concur automatically in any through rate established by Santa Fe pursuant to Paragraph 2 of this agreement for any shipment to or from the rail lines of Tulare and of SJV Railroad so long as Tulare and SJV Railroad individually or combined receive the divisions of of revenue which are set forth in Table 1 of Paragraph 30 of the [1992 Agreement].  If a shipment covered by the provisions is made from a station that is not listed in Table 1 of Paragraph 30, then the division payable to Tulare and SJV Railroad, or to either of them, shall be equal to the division to the listed station that is closest to such unlisted station.  SJV Railroad acknowledges that has received a copy of Paragraph 30 of the [1992 Agreement] and affirms that it accepts the divisions set forth therein.

### B.  Service Agreement Between TVRR and SJVR

On December 21, 1992, TVRR executed a document titled "Service Agreement" (hereinafter, the "Service Agreement") that set forth the conditions of SJVR's activities as

---

[2]   Through routes and through rates refer to the arrangements made between BNSF and shippers whereby a single price is quoted for freight being hauled to, or originating from, stations served by SJVR.  The single price quoted to the shipper includes both BNSF's portion as the long-haul transporter and SJVR's portion as the short haul transporter.  The total payment received by BNSF is divided between BNSF and SJVR according to the rates provided in Table 1.

agent of TVRR.  Doc. # 52, Exhibit "A" (sealed).  Of significance to this action, the Service

Agreement prohibited the following acts by SJVR:

1.  [Publication] tariffs or enter[ing] into transportation contracts or agreements other
    than in the name of [TVRR].

2.  [Participation] in or [entrance] into contracts or agreements with third parties other
    than in the name of [TVRR].

3.  [Participation] in or [entrance] into agreements establishing joint rates or through
    routes other than in the name of [TVRR].

4.  [Acceptance or receipt of] any divisions of rates or allowances, switching charges, or
    other payments, accept as otherwise provided [in the Service Agreement.]

The Service Agreement provided that TVRR would retain all non-operating revenues

accruing to it under the 1992 Agreement.  The Service Agreement provided that SJVR

would submit an account of gross operating revenue earned for each month and would be

paid 85% of the gross revenue within fourteen days of submission of the accounting.  The

Service Agreement also provided that the total of operating revenue paid to SJVR by TVRR

could be adjusted in order to provide the later with certain minimum amounts to cover

Taxes, maintenance costs covered by TVRR and administrative costs.

### C. The 1994 Letter of Agreement

The document that appears to be at the center of BNSF's contention regarding its

obligations to report on yearly through rate changes and to make corresponding adjustments

to Table 1 rates is a document titled "Letter of Agreement" dated April 1, 1994, (hereinafter,

the "1994 Letter").  The 1994 Letter reflects an agreement between BNSF's predecessor,

Santa Fe, and SJVR.  TVRR is not involved in the 1994 Letter.  The 1994 Letter appears to

be primarily concerned with two activities; the rental and storage of freight cars, and the

direct payment of revenues from Santa Fe to SJVR for the hauling and switching between

main-line and branch-line stations.  With regard to car rentals, the 1994 Letter provides that

BNSF (Santa Fe) is to have the first right of refusal to supply freight cars for loading by

SJVR at branch line stations. The 1994 Letter sets forth terms for rental, delivery and

storage of freight cars by the parties and the allocation of liability that might arise from car rental, storage and switching.

With regard to revenue payments, the 1994 Letter has an attachment also referred to as "Table 1" which sets forth what are termed "switching absorption rates" for all of the branch line stations serviced by SJVR.  BNSF contends, and SJVR does not appear to dispute, that the "Switching Absorption Charges" referenced in the "Table 1" contained in the 1994 Letter (hereinafter, "1994 Table 1") are the same as "General Traffic Divisions" set forth in Table 1 of the 1992 Agreement.  By inspection, the rates set forth in the 1994 Table 1 are, as BNSF alleges, the same as the rates on the 1992 Table 1, except that the per car division for the Visalia station is increased to $395 in the 1994 Table 1 and there is an additional station, Goshen, listed in the 1994 Table 1.  The court also notes that, although the 1994 Letter applies the term "Switching Absorption Charges" for what appears to be the first time, "Table 1" in both the 1992 and 1994 versions bears the same title – "General Traffic Divisions" – and uses the same verbiage to describe the fees listed in the third column – "Division per Loaded Car (other than STCC 32952 or STCC 14413)."  Based on these similarities and on the representations of the parties, the court concludes the "Switching Absorption Rates" paid by BNSF pursuant to the 1994 Table 1 represent payment for the same services that were paid under Table 1 of the 1992 Agreement.

With regard to the payment of Switching Absorption Charges, the 1994 Letter provided:

> [Santa Fe] shall pay [SJVR] the per car charges (hereinafter "Switching Absorption") as shown in Table 1 for each loaded revenue car interchanged between [Santa Fe] and [SJVR] on freight shipments originating on or destined to facilities located on branch lines served by [SJVR].

The 1994 Letter makes no other provisions with regard to the duty of Santa Fe (BNSF) to report changes in its through rates or to adjust the Switching Absorption Charges on the basis or increases or decreases in its through rates.  Other than two provisions not relevant to this dispute, the only other relevant provision of the 1994 Letter dealt with the entirety of the agreement as follows:

12

> This Letter constitutes the entire agreement between the parties with respect to the subject matter hereof, and no modification or alteration of the terms hereof shall be binding unless such modification or alteration shall be in writing and executed by the parties.  If any term, covenant or provision of this Letter, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, then in such event the remainder of this Letter or the application of such terms, covenants or provisions to any party or circumstance shall not be affected thereby, and each term, covenant and provision here of shall remain valid and enforceable to the fullest extent permitted by law.

Doc. # 52 at ¶ 8 (sealed).

## II.  Key Contentions

### A.  Is the Yearly Adjustment to Rates in Either Table 1 a Condition Precedent?

SJVR contends that BNSF's duty under the last portion of Paragraph 31 of the 1992 Agreement to report changes in its through rates to stations served by SJVR and to apply the percentage change, whether up or down, to the Divisions of Revenue in Table 1 is a condition precedent to BNSF's authority to set through rates and to SJVR's duty concur in those through rates.  The court disagrees.  "Under the law of contracts, parties may *expressly* agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event. [. . . .] Thus a condition precedent is either an act of a party that *must* be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises."  Platt Pacific, Inc. v. Andelson, 6 Cal.4th 307, 313 (1993) (italics added).  So far as the court can determine, there is no express provision in Paragraph 31 of the 1992 Agreement or elsewhere in that agreement or in any subsequent agreement that would indicate that the duty to report through rate changes and apply them to the rates in Table 1 is a condition precedent to BNSF's right to set through rates and SJVR's duty to concur in those rates.  At best, from SJVR's standpoint, the last portion of Paragraph 31 creates an ambiguity.

> The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Cal.Civ.Code § 1636].  If contractual language is clear and explicit, it governs. (Civ.Code § 1638).  On the other hand, if the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. [. . . .] The mutual intention to which the court give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic

13

1    evidence of such objective matters as the surrounding circumstances under
     which the parties negotiated or entered into the contract; the object, nature
2    and subject matter of the contract; and the subsequent conduct of the parties.

3    People v. Shelton, 37 Ca.4th 759, 767 (2006) (internal citations and quotation marks

4    omitted).

5              A number if facts, both intrinsic and extrinsic to the 1992 Agreement, indicate that

6    neither party intended that the portion of Paragraph 31 that required BNSF or its predecessor

7    to report increases or decreases in through rates established a condition precedent to

8    TVRR's or SJVR's obligation to concur in the through rates.  First, the language imposing

9    the duty to report increases or decreases in through rates yearly is physically separate from

10   the provisions establishing Table 1 as the division of revenues to be paid and establishing

11   the duty of SJVR or TVRR to concur in those rates.  While that fact is certainly not

12   dispositive, the court finds it notable that Paragraph 31 is the only paragraph in the entire

13   1992 Agreement that contains three un-numbered separate paragraphs.  The first is the

14   largest paragraph dealing with the setting of divisions of revenue under Table 1 and the duty

15   of SJVR or TVRR to concur in the rates so long as the division of revenue is maintained

16   according to Table 1.  The second paragraph of Paragraph 31 confines BNSF's duty to pay

17   to cases where BNSF is in the line-haul route and where the car being moved is a revenue

18   car.  The third paragraph of Paragraph 31 is physically separated and deals with BNSF's

19   duty to report percentages of increase or decrease in through rates and to adjust Table 1

20   accordingly.  The impression that arises out of the physical relation of the three paragraphs

21   is that the parties primary purpose was to set up a mechanism that would enable BNSF to set

22   through rates that would be stable over time and that would not be contingent on subsequent

23   concurrence of the short-haul providers.  The second and, in particular, the third paragraphs

24   of Paragraph 31 appear to have been added as afterthoughts to protect the concerns of both

25   the "seller" and "buyer."[3]

26   _____

27       [3]    The court also finds it notable that neither party currently employs any person who was closely involved
     with the drafting or execution of the 1992 Agreement.  This fact alone, while again not dispositive, argues against
28   providing meaning or consequence to any provision of the 1992 Agreement that is not explicit therein.

                                                    14

Second, an examination of the whole of the 1992 Agreement indicates that the parties' primary concern was not a mechanism for the adjustment of freight revenues between the long-haul and short-haul providers.  Rather, the purpose appears to be the establishment of an agreement that establishes the "buyer" as the regional short-haul provider and provides a framework that is both stable and adjustable so that both parties can effectively market the services without need to quote hauling rates that are contingent on approval by the other party.  The reliance on the division of revenues in Table 1 and the duty of TVRR and SJVR to concur in those rates provided the stability needed to effectively market freight services.  The freedom of the parties to make other agreements – an option that was apparently used with some frequency – provided the flexibility to address the concerns of each party over time.  In this context it appears to the court that the duty of BNSF or its predecessor to report upward or downward movement in its through rates and to make corresponding adjustments to Table 1 was intended as a separate mechanism to check imbalances in financial benefits or burdens accruing to either party.  The court cannot find from the context of the 1992 Agreement as a whole any intent to establish the reporting of increases or decreases in through rates as a condition precedent to BNSF's obligation to pay according to the rates set in Table 1 or in SJVR's duty to concur in those rates.

Third and finally, an examination of the conduct of the parties following the execution of the 1992 Agreement, the 1992 Marketing Agreement and the 1994 Letter evinces no intention by any of the parties that the reporting of increases or decreases in through rates was intended to be a condition precedent for the authority of Santa Fe (BNSF) to pay the divisions of revenue as listed in either Table 1 or in the 1994 Table 1 or of the obligation of TVRR or SJVR to concur in those rates.  SJVR has moved to admit additional documents that it contends demonstrate that SJVR was not bound under the 1994 Letter but that the April 1, 1994 Letter was superceded by a Letter that was executed fifteen days later; that Letter also between Santa Fe and SJVR.  With regard to the April 15, 1994 Letter SJVR contends:

Consideration of the SJVR/BNSF April 15, 1994 Amendment reveals two

15

important facts which have thus far not been revealed to the Court: (1) the April 1st and 15th Letter Agreements were meant to amend the SJVR Contract [by which SJVR means the 1992 Marketing Agreement and an "Interchange Agreement executed in 1993], *not* the 1992 TVRR Agreement; and (2) the SJVR/BNSF April 1 1994 Amendment was superceded two weeks later by the April 15th Letter Agreement and was therefore no longer operative.

Doc. # 228 at 4:4-8.

The court disagrees with SJVR's interpretation of the status of the 1994 Letter with regard to division of revenues. As noted above, the 1994 Letter enabled Santa Fe (BNSF) and SJVR to deal directly with each other with regard to two main topics; car rental ("car hire") and direct payment of divisions of revenue under the 1994 Table 1. The April 15, 1994 Letter is concerned with the former function only. As the April 15 Letter states: "[t]he care hire and reclaim provisions set forth in the interchange agreement dated April 1, 1994, are superseded by the provisions of this letter agreement so long as this letter agreement remains in effect." Doc. 228 at Exh. "C". Contrary to SJVR's assertion, the April 15, 1994, Letter did not supercede the April 1 Letter with regard to divisions of revenue under Table 1. The Letter of April 15, 1994, does not have any effect on the court's conclusion regarding the issue of whether the provisions of Paragraph 31 in the 1992 Agreement were intended to be a condition precedent to BNSF's authority to set through rates and SJVR and TVRR's duty to concur in those rates.

As something of an aside, the court also rejects SJVR's contention that either the 1994 Letter or the Letter of April 15, 1994, modified the 1992 Agreement. SJVR was not a signatory to the 1992 Agreement and had no rights thereunder. Starting on April 1, 1994, SJVR dealt directly with BNSF through the Letter agreements of April 1 and April 15, 1994, until SJVR purchased TVRR's rights under the 1992 Agreement in 1999. From the facts alleged by both parties, it appears clear to the court that what happened on April 1, 1994, was that BNSF arranged to pay SJVR 100% of the freight revenue for SJVR's short-haul services using the 1994 Table 1 as the document that determined the fees payable for SJVR's Services. Significantly, the 1994 Letter does not mention the 1992 Agreement at all. As of April 1, 1994, Paragraph 31 of the 1992 Agreement became superfluous because

16

all divisions of revenue arising from through rates were paid directly by BNSF to SJVR under the April 1, 1994 Letter.  After the execution of the 1994 Letter, TVRR received no revenues under Paragraph 31 for division of through rate revenues because those revenues were paid directly by BNSF to SJVR.  As a consequence, TVRR had no interest in whether BNSF made adjustments to Table 1 based on BNSF's increases or decreases in through rates and SJVR had no authority to make any such demands because it was entitled to direct payment only under the terms of the 1994 Letter.

Because the court concludes that the duty of Santa Fe (BNSF) to report percentage increases or decreases in its through rates to or from the stations served by SJVR is not a condition precedent to the ability of BNSF to maintain the division of revenues set forth in Table 1 or the 1994 Table 1, the court finds that BNSF or its predecessor Santa Fe did not lose authority to set through rates until such time as SJVR provides or provided the required 90-day notice of cancellation of the 1994 Letter pursuant to Paragraph 11 of the 1994 Letter.

Based on the foregoing, the court finds that BNSF did not breach the 1992 Agreement in any way from the date of execution until 1999 when TVRR's rights and interests were sold to SJVR.  Stated another way, from 1994 until 1999, BNSF had no duty to report percent increases or decreases in through rates or to adjust rates payable under Table 1 because the party entitled to receive that adjustment – TVRR – was not receiving any revenue from through route hauling because all of that revenue was going to SJVR.  SJVR, in turn was bound by solely the terms of the 1994 Letter which did not provide for automatic adjustments based on increases or decreases in the through rates.  It is also clear from the foregoing that SJVR, as assignee of TVRR's rights under the 1992 Agreement cannot maintain the claims it now asserts against BNSF for breach of duties under Paragraph 31 of the 1992 Agreement between 1994 and 1999 since BNSF did not owe anything to TVRR under Paragraph 31 from 1994 until TVRR assigned its rights in 1999.

### B. Waiver and Estoppel

What remains to be determined is whether BNSF can be held liable for breach of the terms of Paragraph 31 of the 1992 Agreement based on its failure to report on or adjust

17

1    divisions of revenue based on upward or downward variations in through rates occurring

2    after SJVR purchased TVRR's rights under the 1992 Agreement.  The answer to that

3    question requires an examination of the legal basis for any such claims and whether such

4    claims are barred by waiver, estoppel or the applicable statute of limitations.

5         As an initial matter, the court notes that its determination that the obligation in

6    Paragraph 31 of the 1992 Agreement to report and adjust Rates in Table 1 according to

7    increases or decreases in through rates is not a condition precedent to BNSF's ability to

8    maintain the rates set forth in Table 1 forecloses any claim by SJVR based on the retroactive

9    application of rates that SJVR contends it had the "untrammeled" right to set.  SJVR did not

10   obtain the untrammeled right to set rates under the 1992 agreement because BNSF's breach

11   of its duty to adjust rates in Table 1 – assuming there was such a breach – did not divest

12   BNSF's authority to set through rates and SJVR's obligation to concur in those rates

13   according to the terms in the 1992 Agreement.  Assuming that it is determined that BNSF

14   has or had a continuing obligation under the 1992 Agreement to make yearly adjustments to

15   the divisions of revenue set forth in Table 1 – a proposition the court will address shortly –

16   such damages as SJVR may claim may only be found in the difference between the divisions

17   of revenue SJVR should have been paid had BNSF performed its obligations under

18   Paragraph 31and the divisions of revenue that were actually paid.

19        Paragraph 16 of the 1992 Agreement sets forth what is essentially a no-waiver

20   provisions as follows:

21        No waiver by either Buyer or Seller, or their respective successors or
     assignees, or failure of either Buyer or Seller, or their respective successors or
22        assignees, to insist upon full and complete performance by the other party to
     this agreement of any of the obligations of that party in this agreement shall
23        constitute or effect a waiver or release of such party's right to insist upon full
     and complete performance of such obligations prior to, or following, the
24        waiver or release, or such party's right to insist upon full and complete
     performance of all other obligations in this agreement.  This agreement shall
25        be amended or modified only by written agreement signed by the parties
     hereto.

26   Doc. # 41 at ¶ 16 (Sealed).

27        While the wording of Paragraph 16 is a little confusing, the court interprets the

28

parties to have agreed to the proposition that future conduct would not erode the rights or obligations of either party under the 1992 Agreement even if, for a time, the parties agreed informally to alter their conduct in one way or another.  What the court does *not* read into this provision is the parties' intent to create present causes of action based on past non-conforming conduct that would not be otherwise actionable either because such causes of action are time barred or because there was a reasonable understanding at the time that the conduct would not be held as actionable later.  In short, the court finds that the no-waiver provisions of Paragraph 16 preserve the parties rights to insist on performance that may have been formally or informally foregone for some period of time but does not create or preserve a cause of action where the cause of action would otherwise be subject to estoppel or time-limits.

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing, It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such a belief to his detriment."  Strong v. County of Santa Cruz, 15 Cal.3d 720, 725 (1975).  In California, the traditional elements of equitable estoppel are: "(1) the party to be estopped must be appraised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the [party asserting estoppel] must be ignorant of the true state of facts; and (4) [the party asserting estoppel] must rely on the conduct to his injury."  Oakland Raiders v. Oakland - Alameda County Coliseum, 144 Cal.App.4th 1175, 1189 (3rd Dist. 2006) (internal quotes and citation omitted).   In cases, such as the one at bar, where the facts alleged sound in fraud or, at minimum as claims of purposeful manipulation of contractual obligations, the Oakland Raiders court observed that the doctrine of equitable estoppel is distinct from waiver because waiver of a contractual right must be *intentional* and the proof of waiver focuses solely on the intent of the party relinquishing the right.  Equitable estoppel, on the other hand, focuses on the *conduct* of the party to be estopped and the reasonable inferences that amay be drawn by the other party.  Oakland Raiders, 144 Cal.App.4th at 1190.  Noting that

equitable estoppel "is, for practical purposes, indistinguishable from the doctrine of implied

waiver through conduct," the Oakland Raiders court held that "'California courts will find

waiver [equitable estoppel] when a party intentionally relinquishes a right *or when that*

*party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable*

*belief that such right has been relinquished.*' [Citation.]" Id. (quoting Waller v. Truck Ins.

Exchange, Inc., 11 Cal.4th 31, 33-34 (1995) (italics added in Oakland Raiders)).

Here, undisputed facts indicate that between 1994 and 2007, Santa Fe, and its

successor BNSF paid divisions of revenue directly to SJVR that were billed by SJVR

pursuant to the rates set forth in the 1994 Table.  Both before and after 1999, SJVR accepted

those payments without apparent complaint and without any evident contention that

divisions of revenue other than those set forth in the 1994 Table 1 were due or that specific

performance of the rate-adjusting function set forth in Paragraph 31 if the 1992 Agreement

was demanded or even being contemplated.  To cast these facts in the context of the

requirements of equitable estoppel, the fact known to SJVR but unknown to BNSF was

SJVR's intent to insist on enforcement of the rate-adjusting provisions of Paragraph 31.  The

fact represented to BNSF through SJVR's conduct reasonably affirmed BNSF's belief that

(1) the provisions of the 1994 Letter governed the terms of division of revenue after 1999

and (2) SJVR concurred in that belief or intent.  SJVR's failure to give any indication of its

intent to demand specific performance of the rate-adjusting provisions of Paragraph 31 of

the 1992 Agreement for a period of at least eight and perhaps nine years and its consistent

conduct during that period of apparent assent to the terms of the 1994 Letter leads the court

to conclude that it would be inequitable at this point to allow SJVR reach back in time to

demand payment accruing from rights that it undeniably had notice of and could have

asserted at least from 1999.

The court notes in passing that the foregoing conclusion could have been arrived at

by another route as well.  Having rejected SJVR's contention that the April 15, 1994 Letter

rendered the revenue division terms of the April 1, 1994 Letter null, the question that

remains is which agreement provided the actual legal basis for division of revenues between

the parties during the period of time from 1999 to 2008?  Because there is no basis to find that either the 1992 Agreement or the 1994 Letter had become inoperative by 1999, the ambiguity as to the source of authority for division of revenues is resolvable, at least in part, by the conduct of the parties after 1999.  Neither party contends that the divisions of revenue that were actually provided between 1994 and 2008 were any different that whan would have been provided by the 1994 Table 1.  Thus, the conduct of the parties after 1994 until the filing of this action indicate clearly that the parties intended to conduct themselves according the revenue division provisions of the 1994 Letter.  Given that the 1994 Letter dealt with "switching absorption charges" – which the court has determined are to be considered synonymous with "Division of Revenues" – and given that the 1994 Letter "constitutes the entire agreement between the parties with respect to the subject matter hereof," the court concludes that both the text of the 1994 Letter and the conduct of the parties thereafter indicates that the 1994 Letter superceded the terms of Paragraph 31 of the 1992 Agreement for the period of time from 1994 through 2008.  There is no contention that BNSF breached the terms of the 1994 Letter.

Based on the foregoing the court concludes that BNSF was not bound by the duty imposed by Paragraph 31 to report percent changes in through rates or to adjust the division of revenues set forth in the 1994 Table 1.  To the extent any duties imposed on BNSF by Paragraph 31 of the 1992 Agreement went unfulfilled, SJVR is equitably estopped to retroactively enforce any such duties or to claim damages arising therefrom.  In neither case did BNSF loose the right to fulfil its obligation to divide revenues with SJVR by paying SJVR the division of revenues or "switching absorption fees" set forth in the 1994 Table 1.

## CONCLUSION

The parties' cross-motions for summary judgment come before the court in a posture that could have been less convoluted.  Basically, Plaintiff's claims as expressed in the FAC are requests for declaratory relief against the counterclaims set forth in SJVR's answer to the FAC.  BNSF's motion for summary judgment is actually a motion for summary judgment against SJVR's counterclaims and SJVR's motion for summary judgment is a motion for

summary judgment on its own counterclaims.  As previously noted, neither party appears to have moved for summary judgment on BNSF's claims as set forth in the FAC.  The court will declare its findings with regard to SJVR's motion and BNSF's counter-motion for summary judgment on SJVR's cross-claims.  The court will then leave it to the parties to determine if there remains any issues in dispute.  The court notes that it has reached its decisions based on the foregoing analysis.  BNSF has alleged other grounds, such as time limits, to support its motion for summary judgment.  The court finds it need not address these arguments at this time.  The court will conduct an analysis of BNSF's additional arguments only if appellate review of this opinion should so require.

THEREFORE, in consideration of the foregoing analysis, it is hereby ORDERED that:

1.    The motion for summary judgment as to TVRR is hereby GRANTED.  TVRR is hereby DISMISSED from this action as to all claims and cross-claims alleged by either of the remaining parties.

2.    The court hereby FINDS and DECLARES as follows: (1) BNSF was not obliged under the terms of the 1992 Agreement to make yearly REPORTS to TVRR as to upward or downward changes in its through rates from 1994 until TVRR assigned its rights and obligations to SJVR in 1999 and did not breach the 1992 Agreement with TVRR by failing to do so; and (2) BNSF was not obliged under the terms of Paragraph 31 of the 1992 Agreement to REPORT upward or downward changes in its through rates to SJVR from its assumption of TVRR's rights and responsibilities in 1999 until the initiation of this action in 2008 or until SJVR provided 90-day notice of cancellation of the 1994 Letter, whichever occurred sooner, and did not breach the terms of the 1994 Letter by failing to do so.  To the extent BNSF may have been obliged to report upward or downward changes in its through rates to SJVR after 1999 under the 1992 Agreement, SJVR is equitably estopped from asserting such claim.

3.    BNSF's motion for summary judgment on SJVR's first cross-claim for breach of the

22

1992 Agreement is hereby GRANTED.  The court hereby FINDS BNSF is entitled to judgment in its favor as to SJVR's first cross-claim for relief.  SJVR's motion for summary judgment as to its first cross-claim for relief is correspondingly DENIED.

4.  The court hereby FINDS and DECLARES as follows: (1)  BNSF was not obliged under the terms of the 1992 Agreement to make yearly ADJUSTMENTS to the division of revenues set forth in Table 1 of the 1992 Agreement based on upward or downward changes in BNSF's through rates from 1994 until TVRR assigned its rights and obligations to SJVR in 1999 and did not breach the 1992 Agreement with TVRR by failing to do so; and (2) BNSF was not obliged under the terms of Paragraph 31 of the 1992 Agreement to ADJUST, upward or downward, divisions of revenue as set forth in Table 1 of the 1994 Letter from SJVR's assumption of TVRR's rights and obligations in 1999 until the initiation of this action in 2008 or until SJVR provided 90-day notice of cancellation of the 1994 Letter, whichever occurred sooner, and did not breach the terms of the 1994 Letter by failing to do so. To the extent BNSF may have been obliged to ADJUST the through rates paid to SJVR after 1999 under the terms of Paragraph 31 of the 1992 Agreement, SJVR is equitably estopped from asserting such claim.

5.  BNSF's motion for summary judgment on SJVR's second cross-claim for breach of the 1992 Agreement is hereby GRANTED.  The court hereby FINDS BNSF is entitled to judgment in its favor as to SJVR's second cross-claim for relief.  SJVR's motion for summary judgment as to its second cross-claim for relief is correspondingly DENIED.

6.  The court hereby FINDS and DECLARES as follows: (1) the right of Santa Fe or its successor BNSF to set through rates and to satisfy its obligation to pay to TVRR the division of revenues due by paying the amount set forth in Table 1 of the 1992 Agreement is NOT conditioned on BNSF's performance of a duty to report yearly upward or downward changes in through rates or to apply such changes to the rates set forth in Table 1, and (2) BNSF consequently did not lose authority under

1  Paragraphs 29, 30 or 31 of the 1992 Agreement to set through rates and TVRR did

2  NOT correspondingly acquire the untrammeled right to set divisions of revenue or

3  other charges pertaining to the performance of its duties under the 1992 Agreement.

4  7.  The court hereby FINDS and DECLARES as follows: (1) the right of Santa Fe or its

5  successor BNSF to set through rates and to satisfy its obligation to pay to SJVR the

6  division of revenues due by paying the amount set forth in Table 1 of the 1994 Letter

7  is NOT conditioned on BNSF's performance of a duty to report yearly upward or

8  downward changes in through rates or to apply such changes to the rates set forth in

9  Table 1, and (2) BNSF consequently did not lose authority under Paragraphs 29, 30

10  or 31 of the 1992 Agreement to set through rates and SJVR did NOT

11  correspondingly acquire the untrammeled right to set divisions of revenue or other

12  charges pertaining to the performance of its duties under the 1994 Letter or the 1992

13  Agreement.

14  8.  In view of the findings and declarations set forth in paragraphs 6 and 7, above, the

15  court hereby GRANTS BNSF's motion for summary judgment as to SJVR's third

16  and fourth cross-claims for relief.  SJVR's motion for summary judgment on its third

17  and fourth cross-claims for relief is correspondingly DENIED.

18  9.  Either party may notify the court of any remaining issue in contention in this action

19  or may otherwise move for disposition of this action in light of this ruling.  If no

20  notice or moving papers are received within twenty-one (21) days of the date of

21  service of this order, the court will declare final judgment in favor of BNSF and will

22  order the case closed.

23  10.  SJVR's *ex parte* application for leave to file supplemental evidence is hereby

24  GRANTED

25  IT IS SO ORDERED.

26

27  Dated:  ___April 18, 2012___

CHIEF UNITED STATES DISTRICT JUDGE

28